No. 2723

Second Circuit

DYKES-BREATHWIT LUMBER CO. v. THAXTON

(Dec. 11, 1926. Opinion and Decree.)
(Jan. 28, 1927. Rehearing Refused.)

*(Syllabus by the Court.)*

1. **Louisiana Digest—Payment—Par. 21, 31.**

One who pays is presumed to owe.
Urquhart vs. Gove, 4 Rob. 207.

Appeal from the Third Judicial District Court of Louisiana, Parish of Union. Hon. S. D. Pearce, Judge.

Action by Dykes-Breathwit Lumber Company against W. M. Thaxton.

There was judgment for plaintiff and defendant appealed.

Judgment reversed and judgment rendered for defendant on his reconventional demand.

S. L. Digby, of Farmerville, attorney for plaintiff, appellee.

H. E. Dawkins, of Farmerville, attorney for defendant, appellant.

STATEMENT OF THE CASE.

REYNOLDS, J. Plaintiff sued defendant for $285.67, damages alleged to have been sustained by it by reason of an alleged breach of contract by defendant to drill for it for $350.00 a well that would furnish sufficient water to supply the needs of its sawmill.

Defendant denied that he contracted to drill such a well and alleged that he only

agreed to furnish for $350.00 a well that would yield all the water that could come through a three-inch pipe; that he had complied with his contract and been paid $100.00 on account thereof; that there was owing to him by plaintiff a balance of $250.00 on the contract and also an additional sum of $13.69 for pipe furnished and labor performed in cutting it in connection with the contract. And he reconvened against plaintiff for the $263.69.

On these issues the case was tried and there was judgment in favor of the plaintiff for $100.00 and rejecting defendant's reconventional demand and defendant appealed.

## OPINION.

The question to be decided in this case is, whether or not defendant guaranteed to deliver plaintiff a well that would furnish sufficient water to supply the needs of its sawmill.

J. S. Dykes testified, (evidence, pages 2 and 6):

"* * * my cousin runs the mill at Middle Ford and he told me he had talked with Mr. Thaxton about the well and I went with him over there and went to see him, and he said he would put down a three-inch well for $350.00; well, I tried to get him off of that price, as it was pretty high for the time; and I told him we were out of water and it was not a question of money and to get right on the well and furnish us a sufficient supply of water to run the plant and I would not argue about the price if he would make a well quick, as the loss of time was what hurt us, as we had a yard full of logs, and they won't stand it in hot time, and he agreed to do that and did get on the well in the next three or four days and commenced work; well, in about three or four days he had the well down where it looked like a sufficient supply of water at that time without putting pumps on it.

"Q. Did you tell him approximately how much water it took to run your plant?

"A. He had put down wells all over the country and said three inch was sufficient."

Aubrey Dykes testified, pages 9, 11, 12 and 14, evidence:

"I had been to see Mr. Thaxton and I wanted to ask Mr. Dykes before I made the trade as he was general manager of the company, and he told Mr. Thaxton he wanted to get a well as we ran out of water, and Mr. Thaxton asked him what size well, and he said he wanted size of well to run the plant and they decided around a three-inch well, as they thought that would be plenty of water to run the plant. He was to put down the well to supply the plant with water.

*  *  *

"Q. Did you all not tell him that you wanted a three-inch well?
"A. I do not remember.

*  *  *

"Q. Did he guarantee that it would supply your needs?
"A. He said it would supply enough.
"Q. You say Mr. Thaxton guaranteed that the well would furnish all the water your plant would use?
"A. That was the way I understood the trade.

*  *  *

"Q. Is it not a fact that you all considered the three-inch well anywhere would supply?
"A. If the water supply was there a three-inch well would be sufficient.

*  *  *

"Q. He was to furnish all the water the plant would use?
"A. Yes, sir, that was my understanding."

W. M. Thaxton testified, evidence, page 18:

"The two Mr. Dykes came up there and told me they were short of water and they understood I was in the well drilling business and I told them at the time I needed it; I run a blacksmith shop; and they wanted water for their mill and discussed

the matter with me about making them a well; and I asked them what size well, and they said a three inch, and I asked them if a three-inch well would supply them, and they said that they had used one that did, and they asked me what I would charge, and I told them $350.00, and they asked me what about guarantee, and I told them I would not with the kind of pump they were going to use; they said they would rather have a steam pump, and I suggested a bell pump. I went ahead and made the well. I did not know how much power they had. I asked them to go down to the mill and see how much water they were putting out at the Bernice mill and see about what size they wanted and they said this three-inch well furnished this plant and they believed it would furnish that down there, and I went and made them a three-inch well and when I got it done I went to Mr. Aubrey Dykes and he said Mr. Jack Dykes did the paying, and I said I had some bills that became due and I would be glad to get pay for it, and he told me he would wait until Jack Dykes came over, and he asked me what I needed and I told him about a hundred dollars, and he said he would pay me the hundred and as soon as Jack comes over we will pay you the balance."

From all of this testimony we are convinced that defendant did not agree to deliver a well that would supply the needs of plaintiff's sawmill. Neither of the defendants swears positively that defendant agreed to make a well that would supply the needs of their sawmill and defendant swears positively that he did not agree to do so.

In our opinion it would be extremely unreasonable for any one to guarantee to drill a well that would supply the needs of a sawmill without, in any way, defining what the needs were.

The term "needs of a sawmill" might mean the water necessary for a boiler, or it might mean the water necessary to fill a pond in which to float logs.

The weight of the evidence, we think, supports defendant's contention that he contracted to drill a three-inch water well that would furnish all the water that could come through a three-inch pipe with the kind of pump plaintiff proposed to use and the evidence convinces us that he did deliver such a well.

The defendant swears positively that the well drilled by him furnished all the water that the pump used by plaintiff could pump and that the lack of water was due to the pump and not to the well. He testified, evidence, pages 20, 22, 30:

"Q. When you connected the pump up, did you see anything; or was there any indication from the working of the pump or flowing that the well was not producing what this pump would bring out?

"A. Aubrey Dykes sent me word that the well was not furnishing enough water, and I went down there and tested it; the amount of water that was coming out was all the water the pump would bring. They were pumping it in this old well.

"Q. Was the pump pumping at the capacity for the size?

"A. Yes, sir.

"Q. Were you ever there when it would not run proper?

"A. No, sir, I only went twice and it was to full capacity according to conditions. One time it was not making as much as the other.

"Q. In this way, was there or not, any sand in the water?

"A. Yes, sir.

"Q. What effect, if any, does sand in the water have upon the lasting qualities of the leather?

"A. Wears them out.

"Q. When the leather gets worn, what effect does that have on the pump?

"A. Lessens the amount of water.

*    *    *

"Q. You had nothing to do with the furnishing of the pump?

"A. Not a thing.

"Q. Did you ever go to this well at any time and find it in a condition that it would not pump all the water a three-inch

pump would bring out of it in that condition?

"A. No.

\* \* \*

"Q. Was that trouble due to the fact that there was not any water in the well or running it too fast?

"A. Running it too fast or sand in it."

Charley Taber testified, evidence, pages 22, 23, 25:

"Q. How long did you work there?

"A. From May until about October.

"Q. During the time that you worked there, did you keep this pump working during the whole time you were on the job?

"A. Yes, sir.

"Q. What, if any use did you make of the pump?

"A. All I know is team pump.

"Q. Was it pumping during the time you were there?

"A. Yes, sir.

"Q. Would you run it all night?

"A. Yes, sir.

"Q. Did it ever stop pumping water?

"A. Not when you would run it slow.

\* \* \*

"Q. They operated it during the dry spell?

"A. Yes, sir.

"Q. Did they operate it any while it rained?

"A. Yes, sir.

"Q. After the rain and the branch filled up, did they use the pump?

"A. No, sir.

\* \* \*

"Q. When you would speed this pump up it would soon burn out?

"A. Yes, sir.

"Q. It would operate all right, speeding it up, until the water gave out?

"A. Yes, sir.

"Q. Do you know whether that was due to the fact that there was a deficiency, or that the water was not there?

"A. No."

The only evidence that attributes the lack of water to a deficiency of the supply in the well is the testimony of the two plaintiffs. Their testimony makes it perfectly plain that neither of them had any extended experience with water wells or deep well pumps. It is well known that the taking of water from a deep well is a delicate task and requires the constant attention of one skilled in the performances of deep well pumps. The evidence shows that the water flowed from the top of the pipe by its own force from the time it was completed up to the time of the filing of this suit, and plaintiff's inability to obtain from the well enough water to supply the needs of its mill may well have been due to a deficiency in the pump.

Defendant testified that the well was accepted by plaintiff. Evidence, pages 11 and 20:

"Jack Dykes comes over and he asks me what I needed and I told him about a hundred dollars, and he said he would pay me the hundred and as soon as Jack comes over he would pay me the balance.

\* \* \*

"I moved on down there and went to work on this and did not see Mr. Jack Dykes until way in the fall and he came down there to the shop and he offered to pay me half and he said the well was not giving satisfaction; it had rained then and he had plenty of water, I suppose; and he offered to pay me half, and I told him I was not working on half. He said, 'I am willing to pay you half,' and I told him no."

This testimony is not disputed, and taking it as true we are bound to conclude that the well was accepted and paid for in part; and this, we think, corroborates the contention of defendant that he fully complied with his contract.

In addition to the balance of the contract price, defendant claims in reconvention $12.69 for pipe furnished and $1.00 for cutting same; but he offered no evidence in support of these claims.

For the reasons assigned, it is ordered, adjudged and decreed that the judgment appealed from be reversed, and it is now ordered, adjudged and decreed that the defendant, W. M. Thaxton, do have and recover of Dykes-Breathwit Lumber Company judgment for the $350.00, with 5 per cent per annum interest thereon from judicial demand, less $100.00 paid; and that plaintiff Dykes-Breathwit Lumber Company pay all costs.